```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

 UNION MUTUAL FIRE INSURANCE COMPANY,

                Plaintiff,              MEMORANDUM & ORDER
                                        18—CV-1570(EK)(ST)

          -against-

 ACE CARIBBEAN MARKET and NEERA
 RAMDIN,

                Defendants.

-------------------------------------x
```

ERIC KOMITEE, United States District Judge:

This is a dispute over liability for a fire that destroyed several buildings in Queens, New York.  The Plaintiff is Union Mutual Fire Insurance Company, which insured four of the fire-damaged buildings; it has asserted negligence claims under New York law.  Defendants are ACE Caribbean, Inc., which operated the grocery store in which the fire started, and the owner of the building, Neera Ramdin; they now move for summary judgment.  Because I find that the Plaintiff has adduced insufficient evidence to create a genuine issue of fact on a key element of its claims — namely, causation — I grant summary judgment.

## I. Background

The following facts are drawn from the parties' Local Rule 56.1 statements, deposition transcripts, the Defendants'

expert reports, and other documentary evidence submitted by the parties. I read the evidence "in the light most favorable to the party against which summary judgment is contemplated" — namely, Union Mutual. *See NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 178 (2d Cir. 2008).

The parties agree that the massive fire originated on ACE Caribbean's premises. They disagree, however, on its cause. Plaintiff claims the fire started because ACE Caribbean misused extension cords or "power strips" in the store, most likely to power one or more refrigeration units that the parties call "coolers" or "freezers" (collectively, "coolers"). Based on certain evidence described more fully below, Plaintiff argues that the finder of fact could reasonably infer that one or more of these coolers were plugged into a wall outlet through a series of "low" or "light" gauge extension cords; that it was unsafe to power the cooler (or coolers) this way, given the electrical load they required; and that these extension cords were the cause of the fire. Defendants, for their part, contend that the cause of the fire is indeterminable.[1]

---

[1] The insurance company for another damaged building sued Defendants for negligence in New York Supreme Court, Queens County. That court denied Defendants' motion for summary judgment on the grounds that triable questions of fact existed. *See Amguard Ins. Co. v. ACE Caribbean Mkt., Inc.*, No. 703672, 2020 WL 7773548 (N.Y. Sup. Ct. Nov. 24, 2020) (supplying no further explanation). The *Amguard* decision is on appeal to the Second Department.

1.   <u>The ACE Caribbean Store</u>

ACE Caribbean operated a grocery store on the first floor of 110-14 Liberty Avenue in Queens.  110-14 Liberty was a two-story, wooden-frame building that sat in the "middle of a row" of similar buildings.  Defendants' Notice of Mot. for Summary Judgment Dismissing the Action Motion ("Defs.' Mot.") Ex. A pt. 2, Exhibits to Fire Marshal Lewis Expert Disclosure ("Lewis Disclosure Exs.") at 74, ECF No. 77-5.  Neera Ramdin owned the building.  Kaminie Singh, who owned ACE Caribbean, leased the premises from Ms. Ramdin.

Singh employed a number of people to operate the store.  Several of them were questioned extensively about the store's layout and use of electronics.  Those witnesses included Kaminie Singh (the store owner), Ms. Ramdin (the landlord), Hemwantie Singh (Kaminie's mother and a full-time employee), and Danesh Gobind (a part-time employee).

Reading the evidence in the light most favorable to Union Mutual, the testimony established that the store had two checkout counters — one in the front, and one in the back — each with a variety of small electronic appliances (cash registers, scales, and the like); two "display" coolers in the middle of the store, at least one of which contained vegetables; another cooler toward the righthand wall, as seen from the entrance, containing beverages; and a fourth, "walk-in" cooler for storage

3

located outside the store's back door, past an employees-only area to the rear.[2]

The witness testimony did not establish definitively whether these appliances were connected to power via extension cords. But reading the evidence in the light most favorable to the Plaintiff, (1) there were three "surge protectors" or "power strips" in the store — one in the front, and two in the back, Gobind Dep. 69:14-23; (2) the two coolers in the middle of the store plugged into one of the two "surge protectors" or "power strips" in the rear of the store, Kaminie Dep. 54:18-22; Gobind Dep. 69:14-23, 80:9-19; and (3) there were no floor outlets near at least one of the center coolers, or by the outdoor cooler, that those coolers could have plugged into directly.[3]

2.  The Fire and Ensuing Investigation

The fire started at approximately 10:52 p.m. on March 4, 2017. No one was inside ACE Caribbean at the time, and no

---

[2] Pl.'s Rule 56.1 Statement ¶ 42, ECF No. 78-1; *see also* Defs.' Mot. Ex. G, Dep. of Denesh Gobind ("Gobind Dep.") 29:1-17; 61:7-63:6, ECF No. 77-14; *id.* Ex. E, Dep. of Kaminie Singh ("Kaminie Dep.") 10:19-24, ECF No. 77-12; *id.* Ex. F, Dep. of Hemwantie Singh ("Hemwantie Dep.") 28:11-15, ECF No. 77-13; Lewis Disclosure Exs. at 69 ("Interview Sheet" recording Fire Marshal Lewis's interview with Kaminie Singh).

[3] Hemwantie Dep. 30:10-17 (did not recall seeing electrical wires emanating from the outdoor cooler, and did not see outlets on the outside wall nearby); Gobind Dep. 50:12-15 ("I'm not sure where [the outside cooler] plugged in."); *id.* 69:11-13 (no "outlets in the floor of the store"). Store employees also left the coolers powered on overnight, including on the night of the fire. Kaminie Dep. 56:2-4; Hemwantie Dep. 35:18-22; Gobind Dep. 42:15-21; *id.* 85:3-6; *see also* Gobind Dep. 27:4-8 (the "cooler in the back of the store . . . always stays on"); *id.* 79:10-23; *id.* 80:23-81:1.

one in the vicinity was seriously harmed.  But four buildings that Union Mutual insured were destroyed or damaged, along with the ACE Caribbean building.  Amended Compl. at ¶ 11, ECF No. 45.  Union Mutual paid approximately $1.5 million in insurance proceeds for damage to the five neighboring buildings, which it seeks now to recover from ACE Caribbean.  *Id*.

Fire Marshal Matthew Lewis of the New York Fire Department ("FDNY") led the investigation into the cause and path of the fire.  Marshal James Kelly was Lewis's supervisor.  In its discovery disclosures pursuant to Rule 26 of the Federal Rules of Civil Procedure, Plaintiff identified Lewis and Kelly as "non-retained" expert witnesses.  Plaintiff's theory of causation is not clearly articulated, but Plaintiff relies heavily (if not entirely) on Lewis's "Fire Incident Report" — on which Kelly signed off — to establish that element.  Kelly also sat for a deposition, though his testimony was based largely on Lewis's findings.

Lewis was unable to fully investigate the ACE Caribbean premises until March 21, when the FDNY used "heavy machinery" to clear his path through the store.  Defs.' Mot. Ex. A pt. 3, Dep. of Matthew Lewis ("Lewis Dep.") 55:24-56:4, ECF No. 77-6 ("[T]he amount of fire that was in the building caused the floor of the second floor and the roof to collapse down into the first floor.  This is why it took so long to even put a

5

cause on it."); *see also* Lewis Disclosure Exs. at 74. During this inspection, Lewis determined (based on burn patterns, among other things) that the fire's "area of origin" was in the back of the ACE Caribbean store. *Id.* 56:6-11.

When he was able to assess the scene at ACE Caribbean, Lewis found a power strip in the store's back-left corner with "four or five" "low gauge" extension cords plugged into it. *Id.* 56:14-18; *see also id.* 148:2-6. Some of these extension cords ran to the back counter area; one plugged into another extension cord; and a third ran behind a bookcase, where it plugged into "more electrical wiring." Lewis Disclosures Exs. at 78 (observing the "fire damaged remains of wires leading from power strip towards the front of the store and terminating in the area of . . . sales counter"); Lewis Dep. 123:2-12; 133:19-134:4 (observing one extension cord "leading away from the power strip along the east party wall towards the rear of the store behind wooden book case"). There were other extension cords plugged into extension cords in this area, though the power source for these cords is unclear. *Id.* 166:22-25 (there were "extension cords plugged into extension cords, . . . completely separate from the power strip," and "one or two of [them] may have run back towards the power strip"). But Lewis was unable to determine where most of these cords ran, or which appliances they powered. He did not indicate that any of the cords he saw

6

powered a cooler. *Cf.* Lewis Dep. 130:21-131:4 (did not determine where soda coolers on right-hand wall connected to power source); *id.* 133:12-18 (he did not "see any outlets where" the central open-top cooler "would have been plugged in, in the floor").

After discovering these cords, Lewis left the premises; he explained that he cut the March 21 investigation short due to the structural risks he faced. *Id.* 56:4-57:8. Lewis did not access this space again.

3. The Fire Incident Report

On March 31, Lewis issued a Fire Incident Report (the "FIR") based on his investigation. The FIR reports that the fire "originated inside 110-14 in the rear of [ACE Caribbean] . . . at floor level, in combustible material." Defs.' Mot. Ex N at 1 ("Fire Incident Report"), ECF No. 77-21. It contains two statements about the cause of the fire that are in some tension with one another; each side invokes the statement it views as more favorable. Plaintiff points to Lewis's notation that the "cause of fire" was an "extension cord." *Id.* This entry corresponded to the "Numerical / Cause Code" "210," which Lewis selected from a prefilled menu on the report. Lewis Dep. 162:20-25 (explaining that he chose this code and description because "[w]e have limited . . . cause codes and titles that we can use"). Elsewhere on the FIR, however, in a box labeled

7

"Description (Specify if Accidental)," Lewis wrote: "NOT FULLY ASCERTAINED DUE TO STRUCTURAL COLLAPSE." Fire Incident Report at 1 (capitalization in original). Defendants, not surprisingly, focus on this statement.

At his deposition, Lewis testified that he reported the cause was an "extension cord" because he "believed" that was the source of the fire. Lewis Dep. 57:20-25 ("[W]e believed it was the extension cords."). Lewis arrived at that belief because he found the "four or five light-gauge extension cords" in the area where the fire began. *Id.* 56:14-18. Lewis explained that, given the limited number of "cause codes" provided, "I could either have used [the code for] extension cords or wiring" in the Fire Incident Report. *Id.* 162:20-23. He ruled out the possibility that "hard wiring" caused the fire, because "the outlet didn't look damaged on the inside," and the burn patterns suggested the fire started "below the outlet." *Id.* 58:2; 109:19-25.

Lewis explained, however, that he was unable to "fully ascertain[]" the cause of the fire due to structural risks in the building. *Id.* 56:23-57:8 ("[W]e got to a point where we got in, we were able to look at the outlet, we were able to find the wiring and the damage we saw on the wiring and it came to a point we decided it was more of a safety concern . . . [and] at that point we said we are done"). He explained that "we

8

couldn't come up and say it was this extension cord . . . . We had the electrical back there. We had the wiring. The wiring had damage, but to actually say that was exactly what caused the fire . . . we couldn't ascertain that." *Id.* 57:20-25; Defs.' Mot. Ex. B. pt. 3, Dep. of James Kelly ("Kelly Dep.") 107:14-18, ECF No. 77-9 ("When we closed this case . . . it was the belief that the fire was caused by a failed extension cord. One of those extension cords — we didn't know which one . . . .").

Lewis acknowledged that Kelly directed him to enter the "NOT FULLY ASCERTAINED" language. Lewis Dep. 230:20-24. Lewis noted that the entry "could have been reworded as not fully ascertained electrical wiring" or "not fully ascertained in the area of extension cords." *Id.* 232:18-21. But Lewis "st[ood] by" Kelly's recommendation, and would have put down "not fully ascertained" even without Kelly's input. *Id*. 231:13-15; *id.* 232:18-23 ("It would still stay not fully ascertained. It could have been reworded as not fully ascertained electrical wiring or not fully ascertained in the area of extension cords . . . .").

Lewis delivered the power strip and extension cords to the FDNY for storage. *Id.* 58:24-25:5. Because the FDNY determined the fire was "accidental," it did not "send [the devices] out for testing." *Id.* 58:7-24.

Defendants report that Plaintiff engaged an expert

9

witness of its own — an electrical consultant and engineer named James Pryor, who told defense counsel that he intended to examine the "wires" and other "artifacts" from the scene. Decl. of Dennis M. Rothman in Supp. of Defs.' Mot. for Summary Judgment Dismissing the Action ¶ 3, ECF No. 77-1. Pryor did in fact go to defense counsel's office to obtain these items. *Id*. In the end, however, Plaintiff did not identify this expert as a witness in discovery or produce any report from him. *Id*. at ¶ 4.

4. <u>Defense Expert Testimony</u>

The Defendants presented testimony and reports from two expert witnesses: Eugene West (a former FDNY fire marshal) and James Crabtree (an electrical engineer and certified fire and explosion investigator). Both experts determined that there was no evidence that the Defendants were responsible for the fire. Defs.' Mot. Ex. K, Dep. of Eugene West 85:17-22, ECF No. 77-18 ("[T]here's no evidence [Defendants] did anything that would have been contributory to the cause of this fire or may have caused this fire."); *id.* Ex. M, Dep. of James Crabtree 72:12-14, ECF No. 77-20 ("[T]here is no evidence that an extension cord caused this incident.").

## II. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact" and

10

that she "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "can affect the outcome under the applicable substantive law." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). A genuine dispute is one that can "reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In performing this analysis, the Court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). "If, in this generous light, a material issue is found to exist, summary judgment is improper." *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n*, 182 F.3d 157, 160 (2d Cir. 1999) (citing *Eastway Const. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985)).

The moving party may establish that there is no genuine dispute "by showing that little or no evidence may be found in support of the nonmoving party's case." *Gallo*, 22 F.3d at 1223-24 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the moving party meets this burden, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998) (citing *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 535-26 (2d Cir. 1994)). However, the non-moving party "must do more than simply show that there is

11

some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal citations and quotations omitted). If "no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotations omitted).

### III. Analysis

To succeed on a negligence claim, plaintiffs must establish the familiar elements of "(1) duty; (2) breach of duty; (3) proximate cause; and (4) damages." *Bah v. Everlast Logistics, LLC*, 297 F. Supp. 3d 426, 431 (S.D.N.Y. 2018) (internal quotations omitted).

Here, Defendants' motion focuses on the third element, causation, though they tend to conflate it at times with the second. For example, Defendants argue that Fire Marshal Lewis "made no determination that the owner or the tenant of the premises . . . used the power strip or extension cords improperly." Defs.' Mem. of Law in Supp. of Summary Judgment Dismissing the Action at 10, ECF No. 77-2; (citing Lewis Dep. 191:25-192:12). This determination would have been relevant to the breach-of-duty element. Likewise, Defendants argue that Lewis was "unaware of any fire codes violated by the defendants," *id.* at 11; this argument, too, is directed at the

12

question of breach rather than causation. I thus consider the elements of breach and causation in turn.

**A.   Breach**

On the subject of a breach, Plaintiff lays out the following syllogism: it is undisputed that there was at least one cooler inside the store, and another one outside, with no outlets near them. These coolers must have been plugged into outlets, and needed extension cords to reach them. The only electrical cords (or power strips) recovered on premises were "low" or "light" gauge cords. And Lewis testified that it would be "unsafe" to use "extension cords plugged into extension cords" to carry as much "amperage and voltage" as would be required for "appliances . . . that need higher power." Lewis 166:23-167:18. Therefore, the Defendants breached the applicable duty of care.

There are potential problems with this syllogism. There is no record evidence at all, for example, concerning the actual amount of amperage or voltage that the coolers would have required. Lewis appears to be speaking, in the quoted passage above, to a set of hypothetical circumstances rather than the actual circumstances he witnessed. But the Court does not need to drill down on these breach-of-duty issues, because Plaintiff's evidence of causation is incontrovertibly inadequate.

13

**B.     Causation**

Plaintiff argues that the "circumstantial evidence" in this case "is legally sufficient to establish Defendants' negligence as being responsible for the cause and origin of the fire." Circumstantial evidence is, of course, admissible to establish the cause of a fire. *See Minerals & Chem. Phillipp Corp. v. S.S. Nat'l Trader*, 445 F.2d 831, 832 (2d Cir. 1971) ("By the very nature of a fire, its cause must often be proven through a combination of common sense, circumstantial evidence and expert testimony."); *N. Am. Specialty Ins. Co. v. Schwanter*, 39 A.D.3d 511, 511-12 (2d Dep't 2007) (denying summary judgment on negligence claim brought by fire-insurance subrogee that relied solely on circumstantial evidence); *see also Holland v. United States*, 348 U.S. 121, 140 (1954) ("Circumstantial evidence . . . is intrinsically no different from testimonial evidence.").

Regardless of the *type* of evidence a plaintiff relies on, however, it must come forward with a certain quantum of such proof. Specifically, a plaintiff must "establish a reasonable probability that the accident was caused by [Defendants'] negligence" rather than some other cause. *Williams v. KFC Nat'l Mgmt. Co.*, 391 F.3d 411, 420 (2d Cir. 2004). In doing so, plaintiffs need not "adduce the most reasonable explanation for the accident" or "eliminate all other possible causes" for it.

14

*Id.* Nor must they "rule out the existence of remote possibilities that the injury was not caused by the defendant, or that the defendant was not negligent." *Olsen v. K Mart Corp.*, No. 04-CV-3648, 2005 WL 2989546, at *5 (E.D.N.Y. Nov. 8, 2005). But the trier of fact still must be able to determine the cause of the injury as a matter of "logical inference." *Schneider v. Kings Highway Hosp. Ctr., Inc.*, 67 N.Y.2d 743, 744 (1986). This means that alternative causes must be sufficiently "remote" that a fact-finder could discredit them without resorting to "speculation." *Id.*

Here, Plaintiff relies heavily on the report and testimony of Fire Marshal Lewis to establish causation. But this evidence does not come close to satisfying Plaintiff's burden. Marshal Lewis testified that he could not opine with confidence on the cause of the fire. Given the Marshal's candid acknowledgment of uncertainty and the dearth of other evidence tending to show causation, the negligence claim cannot survive summary judgment.

"Where the evidence . . . is capable of an interpretation equally consistent with the presence or absence of a wrongful act, that meaning must be ascribed which accords with its absence." *Prunier v. City of Watertown*, 936 F.2d 677 (2d Cir. 1991) (quoting *Lahr v. Tirrill*, 274 N.Y. 112, 117

15

(1937))).  As the court explained in *Bernstein v. City of New York*:

> Where the facts proven show that there are several possible causes of an injury, for one or more of which the defendant was not responsible, and it is just as reasonable and probable that the injury was the result of one cause as the other, plaintiff cannot have a recovery, since he has failed to prove that the negligence of the defendant caused the injury.

69 N.Y.2d 1020, 1021 (1987) (internal quotations and citations omitted)).  Here, Lewis's report and testimony cannot fairly be read to support the conclusion for which Plaintiff relies on them.  And it allows for other possible causes — like a manufacturing defect — that are just as reasonable.

Lewis did list "Extension Cord" in the "Cause of Fire" field in his Fire Incident Report (on which Kelly signed off).  Fire Incident Report at 1.  But immediately below that, in the "Description" field, Lewis qualified that statement: "NOT FULLY ASCERTAINED DUE TO STRUCTURAL COLLAPSE."  *Id*.  In his deposition testimony, Lewis acknowledged having reported (in the FIR) that "the extension cord" was the cause of the fire.  Lewis Dep. 183:13-19.  But Lewis maintained that he was, in the end, unsure about the fire's precise cause:

> Q.   If you were sure if it was actually the extension cord, would you have listed that in your report?

16

> A. Yes.
>
> Q. If you were sure it was the power strip, you would have listed that in your report?
>
> A. Yes.
>
> Q. But in this case, since you didn't list it, it's safe to say you couldn't ascertain that's exactly what happened?
>
> A. Right.

*Id.* 186:4-15.

Moments later, Lewis confirmed that he "couldn't make that determination" as to "what caused the fire." *Id.* 191:10-14. Asked whether he ever "determine[d] any evidence of any nature that there were any problems ever with the extension cord or power strip," he confirmed that he had not. *Id.* 191:16-24. Kelly, too, testified that the FDNY could not determine the actual cause of the fire. Kelly Dep. 64:9-24 ("I feel quite sure that the fire started in that area; other than that, I can't tell you what failed or why. I believe it was not fully ascertained."); *id.* 69:17-25 (confirming "there's no certainty with respect to the cause" of the fire, and that the FIR said it "was a failure in the wires because there was nothing else there except the wires, and that's why it's not fully ascertained because we really don't know."). Indeed, Lewis testified that he selected the "extension cord" designation because he was

17

hamstrung by the list of available codes he could choose, and the only code that made sense was the extension-cord code. Lewis Dep. 162:20-163:14 (explaining that "[w]e have limited . . . cause codes and titles that we can use," his only options were "extension cords or wiring," and he ruled out "wiring" because that meant "hard wiring in the walls and ceilings," which he had no evidence to support).

        This is not testimony from which a reasonable trier of fact could determine that the misuse of extension cords was "more likely than not" the cause of the fire. It simply does not "establish a reasonable probability that the accident was caused by [Defendants'] negligence" rather than some other cause. *Williams*, 391 F.3d at 420; *see also Ongley v. St. Lukes Roosevelt Hosp. Ctr.*, 725 F. App'x 44, 47 (2d Cir. 2018) (expert's "causation theories were too speculative to survive summary judgment" because he was "unable to state to any reasonable degree of medical certainty which of . . . three possibilities caused the injury"). This is true even at the high level of Lewis's *conclusion* — before taking up Plaintiff's burden to "come forward with *specific facts* showing that there is a genuine issue for trial." *LaBounty*, 137 F.3d at 73.

        Indeed, the more Lewis's deposition delved into the realm of specific facts, the more Lewis undermined the Plaintiff's contention. Asked, for example, if it was "possible

18

that the [extension] cord could have had a manufacturing defect?", Lewis responded "Very well could have, yes." Lewis Dep. 187:17-21. Lewis acknowledged that he could not "determine with a reasonable degree of fire science certainty" whether or not the extension cord was "overloaded." *Id.* 187:7-11; *see also id.* 189:8-21 (Lewis was uncertain whether an overload occurred, because he was unable to ascertain what was plugged into the power strip).[4]

Put simply, neither Fire Marshal conclusively determined the source of the fire. They opined that it could have been the extension cord, but given the facts before them, they were ultimately unsure. And they acknowledged, repeatedly, that other causes were possible. This evidence does not raise a genuine issue of fact as to causation. *Olsen*, 2005 WL 2989546, at *5 (no causation "where it is just as reasonable and probable that the injury was the result of" another cause).[5] Plaintiff's

---

[4] None of this, needless to say, is to impugn either of the Fire Marshals' expertise. Indeed, their candid acknowledgments of uncertainty reflect obvious professionalism and care. This opinion cites their acknowledgments of uncertainty simply to explain why the Plaintiff cannot carry its burden at the summary judgment stage in reliance solely on their analysis.

[5] To the extent Plaintiff relies on its logical syllogism (separate and apart from Lewis's testimony), the evidence of causation remains insufficient to surpass summary judgment. The relative placement of extension cords and appliances in the store, including coolers, does not make the misuse of extension cords more likely a cause than other alternatives, including, for instance, design or manufacturing defects in the cords themselves. Lewis Dep. 187:17-21 (cause "very well could have" been manufacturing defect).

negligence claims against ACE Caribbean and its owner, Ms. Ramdin, are therefore dismissed.

## IV.  Conclusion

For the reasons set out above, Defendants' motion for summary judgment is granted in its entirety.  The Clerk of Court is directed to enter judgment and close this case.

SO ORDERED.

/s Eric Komitee_____
ERIC KOMITEE
United States District Judge

Dated:    September 30, 2021
          Brooklyn, New York